## HART v. CRANE.

(Circuit Court of Appeals, Eighth Circuit. December 3, 1917.)

No. 4796.

1. MORTGAGES ⬤⇒38(1)—EVIDENCE AS TO CHARACTER OF INSTRUMENT—WEIGHT AND SUFFICIENCY.

Where one of the owners of land executed a note to a bank, with defendant apparently as surety, and filled in defendant's name as grantee in a deed previously executed in blank, and defendant subsequently paid the note and recorded the deed, evidence held to show that the deed, though absolute on its face, was given as security.

2. MORTGAGES ⬤�safe38(2)—EVIDENCE AS TO CHARACTER OF INSTRUMENT—DEGREE AND PROOF.

Evidence to show that a deed absolute on its face is a mortgage must be clear and convincing.

Booth, District Judge, dissenting.

Appeal from the District Court of the United States for the Western District of Missouri; Arba S. Van Valkenburgh, Judge.

Suit by Pennock Hart against W. S. Crane. From a decree in favor of defendant, plaintiff appeals. Reversed and remanded.

Frank H. Sullivan, of St. Louis, Mo. (S. Duffield Mitchell, of West Chester, Pa., John W. McAntire, of Joplin, Mo., George F. Haid, of University City, Mo., and Jones, Hocker, Sullivan & Angert, of St. Louis, Mo., on the briefs), for appellant.

Thomas Hackney, of Kansas City, Mo. (Edward J. White, of St. Louis, Mo., and Martin Lyons, of Kansas City, Mo., on the brief), for appellee.

Before SANBORN and CARLAND, Circuit Judges, and BOOTH, District Judge.

CARLAND, Circuit Judge. The appellant commenced this action against appellee for the purpose of having a warranty deed of conveyance from himself and the other grantors, Mitchell and Evans, dated October 19, 1911, whereby there was granted to appellee 80 acres of land in Jasper county, Mo., declared to be a mortgage, that a judicial sale of a certain undivided interest in the land owned by Mitchell be declared void, and that appellant be allowed to redeem. The District Court referred the case to a master, who made findings of fact and conclusions of law. On exceptions to these findings, the same were confirmed by the trial court.

The decision below having sustained the integrity of the deed, the case did not proceed to a consideration of the other issues in the case. The question, therefore, before this court is: Did the trial court err in sustaining the deed? Counsel for appellant concedes the rule that the legal presumption is that the finding and decree of a court of chancery are right, and they should not be disturbed or modified by an appellate court, unless an obvious error has intervened in the application of the law, or some grave mistake has been made in the consideration of the facts. But counsel claim that a grave mistake was committed by the master and the court below in refusing to find as facts some of the most important elements in the case and about which there can be no shadow of doubt from the uncontradicted evidence. We have therefore given the evidence careful consideration. The testimony bearing upon the question as to whether the deed was an absolute conveyance or a mortgage is not voluminous, and consists largely of the testimony given by the witness Mitchell and appellee. Mitchell is one of the grantors, but he and Evans, the other grantor, conveyed their interest in the land to appellant in July, 1913, for $100 each.

[1] Notwithstanding Mitchell parted with his interest in the land, we think it sufficiently appears that he was not a disinterested witness.

Prior to the execution of the deed of October 19, 1911, appellant, Mitchell, and Evans were the owners of the land in controversy by conveyance from one H. R. Chitwood in the following undivided proportions: Appellant, three-eighths; Mitchell, three-eighths; and Evans, one-fourth. Prior to the transaction in question Mitchell and appellee had some dealings in relation to the land, but they throw no light on the question under discussion. About the middle of October, 1911, Mitchell was making an effort to dispose of the property, and in order to be prepared to make a deal he decided to get a warranty deed executed and acknowledged by the owners of the land. Mitchell testifies that this decision was made with the knowledge of appellee, who was also trying to find a purchaser for the land; but whether this is so is unimportant. Mitchell obtained the deed in controversy, executed in blank as to grantee and consideration by Hart and Evans. Mitchell filled in the blanks. In a letter by Evans, dated October 20, 1911, at Pittsburgh, Pa., inclosing the deed to Mitchell, Evans stated:

"I hope you will make the riffle, and anything you sell for will be agreeable to me and Pennock Hart."

In a letter by Pennock Hart, dated May 31, 1911, Pennock Hart said:

"Would it be possible to sell half the property, and lease the other half? Harry [Evans] and I will agree to anything that will let you out."

Mitchell testified: That on October 30, 1911, he was in need of funds. That a few days before appellee had said that he could get the Bank of Carthage, Mo., to loan him (Mitchell) $2,750, and that he (appellee) would become surety on the note. That Mitchell should deposit the deed from Hart, Mitchell, and Evans with the bank, after inserting appellee's name as grantee and the words "one dollar and other consideration" as the consideration, to secure appellee for becoming surety on the note. That pursuant to this arrangement on the above date Mitchell gave his note to the Bank of Carthage for $2,750, payable in three months at 8 per cent., with appellee as surety. The proceeds of the note, $2,695.50, being the face of the note less $54.50 discount, was placed to the credit of Mitchell on the books of the bank. That the deed was delivered to Maring, cashier of the bank, by appellee, with the statement that, when Mitchell paid the note, the deed was to be returned to Mitchell.

When the note became due, Mitchell did not pay the same, but appellee paid it about 38 days after it became due. At the time of this transaction Mitchell owed Crane $675, which he paid out of the proceeds of the note. It does not appear what was done with the balance. Appellee paid the note March 9, 1912, and had the deed recorded. Mitchell signed the note as principal, and appellee as surety. Appellee testifies that this was done so as not to inform the bank that he was the real borrower of the money, and not Mitchell. Appellee was a director in the bank at the time. Maring, cashier of the Bank of Carthage, testified that the loan was made to Mitchell with Crane as surety. At the time of the making of the loan Thomas & Hackney, attorneys, passed upon the title to the land and made their report to

the Bank of Carthage for which Mitchell paid. More than 13 months after the transaction in regard to the loan Mitchell paid back taxes on the land.

Mitchell and appellee both testified: That at the inception of the transaction Mitchell was desirous of obtaining a loan from appellee. Appellee testifies that he first saw the deed from Mitchell, Hart, and Evans about October 26th or 27th. That in September, 1911, Mitchell wanted some money, and wanted to know if appellee would loan any money on the property. That appellee replied that he would not loan any money on the land. That appellee did not know whether the title was clear or not; suggested that Mitchell get an abstract. That Mitchell must get an abstract before appellee would have anything to do with the land, and the abstract would have to be passed upon by his attorneys. Appellee further testified: That he figured on buying the property from Mitchell, and the deed was delivered to appellee at the office of Thomas & Hackney. At the time the deed was delivered the two letters heretofore referred to from Hart and Evans were also delivered to appellee. That the papers were delivered to appellee, and not to the bank. That appellee asked the bank to keep the papers, to put them with his papers in the bank. Appellee never consented to Mitchell retaining the abstract. That Mitchell promised to bring it back, but never did. That the actual price appellee was to pay for the land was $2,695. Appellee told Mitchell that he was short of money, and did not have the money on hand sufficient in actual cash to pay for the land, but would get it from the bank, and did not want to be in the attitude of borrowing himself, and that he did not want the people at the bank to know anything about his business transactions whatever. Appellee told Mitchell he would pay him $2,695 in cash for the land. The reason appellee did not immediately place the deed on record was that there was a judgment against the property in favor of Mrs. Munhall of $2,800, and the statute of limitations would run on it in July of the next year.

Appellee had the deed recorded at the time he did because, either on the morning of the 8th or 9th of March, Mr. Thomas called appellee up and told him that his land was advertised for sale for taxes; that Mitchell agreed to pay the taxes down to 1912, but he did not do it. The tax sale proceeding was against Chitwood, the grantor of Hart, Mitchell, and Evans, who appeared on record as the owner of the land. Mr. Mitchell did not turn the papers over to Mr. Maring, the cashier of the bank. "They were given to me by Mitchell, and I left them with the bank among my papers. That appellee never told Mitchell that, if he paid the note, the deeds would be returned."

There was evidence that at the time of the transaction resulting in the loan from the bank the land in question was worth $300 per acre. There was also evidence that, as agricultural land, it was worth from $50 to $55 an acre. The master found the value of the land would not exceed $100 per acre. On October 30, 1911, the land was occupied by one Foster, who farmed it in a small way, paying or agreeing to pay $50 per year rent. There was no change of possession up to the time the suit was commenced. Appellee testified that he told Foster

he was willing that he should remain upon the land, whether he paid rent or not.

[2] These are the salient facts in connection with the controversy upon the question as to whether the deed, although absolute in form, was really a mortgage. The testimony of Mitchell is in direct contradiction of that of appellee. In favor of appellant's contention is the fact that both parties agree that, when Mitchell approached appellee, it was to secure a loan; that he subsequently obtained the loan from the Bank of Carthage, and appellee signed the note as surety, taking, as Mitchell claims, the deed by Hart, Mitchell, and Evans as security. We do not attach much importance to the fact that Mitchell obtained an abstract of the property and paid for an examination of the same. In most localities this would be one of the duties of the vendor or mortgagor. In favor of appellee it appears that the deed is absolute on its face, and it is the rule that the evidence which is necessary to show it to be a mortgage must be clear and convincing.

If the transaction was intended as a sale of the land, the method adopted for that purpose was certainly unusual; that Mitchell borrowed the money from the bank and appellee became surety on the note is undisputed. On the face of the transaction the money all belonged to Mitchell; still, if we are to sustain the integrity of the deed, we must find that the money did not belong to Mitchell, but to appellee, in face of the fact that Mitchell paid out of the proceeds of the note $675 to appellee. It is said the true nature of the transaction was obscured by reason of the fact that the parties wished to avoid judgment liens then in existence against Mitchell; but the transaction as carried out would not be effective for any such purpose. It is also said that the other grantors, Hart and Evans, so far as their action is concerned, contemplated a sale, and that Mitchell probably had no authority to put the deed up as security.

We are of the opinion, however, that under the evidence in the record in regard to the relationship of the several grantors that Mitchell had authority to do anything with the property that would let him out. The master thought that it was reasonable to believe that, if the parties intended anything but an absolute sale, they would have insisted upon and obtained a contract evidencing the arrangement. Of course, if the parties had done so, there would have been no lawsuit; but, as they did not do so, the case must be judged upon the facts as they appear. The rule that a deed absolute upon its face can be shown by parol evidence to be a mortgage exists because parties do not always execute a mortgage when one is intended. We are of the opinion that the conceded fact that Mitchell first applied to appellee for a loan becomes of great importance in the decision of this case. Morris v. Nixon, 1 How. 118, 11 L. Ed. 69; Cobb v. Day, 106 Mo. 278, 17 S. W. 323. If it was not for the fact that the master and trial court have decided the question at issue in favor of appellee, we should have no hesitancy in holding upon the facts that the deed from Hart, Mitchell, and Evans to appellee was in fact a mortgage; but, notwithstanding the finding below, we think the circumstances as detailed in the record require us to differ with the master and the court.

The decree below is reversed, and the case remanded for such further proceedings as law and justice may require.

BOOTH, District Judge. I dissent. The testimony of the two parties to the transaction in controversy was in direct conflict. The circumstantial evidence in part tended to corroborate one, in part the other. No obvious error by the court below in the application of the law is pointed out, and in my judgment there was no grave mistake made in the consideration of the facts. In accordance with the well-established rule applicable under such circumstances, the decree below should be affirmed